IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

INNOVATION MARINE PROTEIN, LLC,
an Oregon limited liability company; and
FRONT ST. MARINE LLC, an Oregon
limited liability company,,

        Plaintiff,

        v.

PACIFIC SEAFOOD GROUP; TRIDENT
SEAFOODS CORPORATION, a
Washington corporation; CALIFORNIA
SHELLFISH COMPANY, INC. a
California corporation; FRANK DULCICH;
DULCICH, INC., an Oregon corporation; CS
PROPERTIES HOLDING COMPANY, LLC,
a Delaware limited liability company; and
TNMP PROPERTIES, LLC, a Delaware
limited liability compnay,

        Defendants,

_____

Case No. 6:17-cv-00815-MC

OPINION AND ORDER

MCSHANE, Judge:

        Plaintiffs Innovation Marine Protein, LLC, an Oregon limited liability company

(Innovation Marine), and Front St. Marine LLC, an Oregon limited liability company (Front

Street) bring this antitrust action under Sections 1 and 2 of the Sherman Act against defendants

Pacific Seafood Group (Pacific Seafood)[1], California Shellfish Company (Cal-Shell), and Trident

Seafoods Corporation (Trident). Defendants move to dismiss for, among other reasons, lack of

_____
[1] Pacific Seafood, engaged in seafood processing, sales, and distribution, consists of more than 55 entities owned
by defendants Frank Dulcich and Dulcich, Inc. First Am. Comp (or "FAC"). ¶ 19.

standing. ECF No. 21, 24-25. Because Innovation Marine and Front Street lack standing, and because leave to amend would be futile, this action is DISMISSED, with prejudice.

# BACKGROUND[2]

Plaintiff Front Street is owned by Stephen and Janet Webster, two long-term residents of Newport, Oregon. "The corporate mission of Front St. Marine, LLC is to *acquire and develop* Newport waterfront industrial property *for the express purpose of building the infrastructure* that will diversify the seafood processing sector on the central Oregon Coast, thus bringing the benefits of robust competition in the form of value-added seafood processing, increased ex vessel prices paid to fishermen and more family wage jobs to Lincoln County." FAC ¶ 18 (emphasis added). "On December 21, 2013, in an effort to secure adequate industrial property on Yaquina Bay in Newport *to build seafood processing infrastructure*, Stephen Webster of plaintiff Front St. Marine LLC forwarded an offer to purchase two parcels owned by [Cal-Shell]." FAC ¶ 49 (emphasis added). Webster made a cash offer of $900,000 for either parcel or $1.8 million for both parcels. FAC ¶49. Included with the offer was "a proposed form of purchase and sale agreement to facilitate a speedy closing of the transaction." FAC ¶ 49. On February 24, 2014, Cal-Shell informed Webster that "'We currently are not interested in the sale' of the two properties." FAC ¶ 50.

15 months later, without contacting Webster, "Cal-Shell sold its former seafood processing facility and operational ice plant to [Pacific Seafood] for just $1,037,500, a 42% discount to the December 2013 offer from Front St. Marine." FAC ¶ 52. "Cal-Shell and Pacific Seafood Group conspired to avoid selling the property to Front St. Marine in order to eliminate the potential for new seafood processor competition at the site." FAC ¶ 52.

---

[2] In resolving the pending motions, I assume the truth of all factual allegations in the complaint and FAC.

For its claim under Section 1 of the Sherman Act, plaintiffs allege:

As part of the Pacific Seafood Group led conspiracy to acquire all available seafood processing facilities from its existing competitors on the West Coast when any particular competitor is interested in disposing of such assets, [Pacific Seafood and Cal-Shell] conspired to deprive [Front Street] *of the opportunity to develop seafood processing infrastructure in Newport* in 2014-15.

FAC 81 (emphasis added).

"But for the illegal conspiracy to restrain trade implemented by [defendants, Front Street] would have acquired the Cal-Shell waterfront property in Newport *and successfully created the infrastructure for new seafood processor competition* in Newport by the end of 2015." FAC ¶ 87 (emphasis added).

For its claim under Section 2 of the Sherman Act, plaintiffs allege that defendants "conspired to monopolize the Newport seafood input markets for trawl caught groundfish, onshore whiting and pink shrimp by conspiring to transfer Trident and Cal-Shell's seafood processing assets in Newport to Pacific Seafood." FAC ¶ 91.

Front Street neither alleges nor seeks any economic damages. Instead, on both claims:

Plaintiff Front St. Marine seeks an order from this Court requiring Pacific Seafood Group to divest itself of the Cal-Shell property that it acquired pursuant to an illegal conspiracy and to transfer that property to plaintiff for the same price paid by [Pacific Seafood] to Cal-Shell. Plaintiff Front St. Marine further seeks interim injunctive relief prohibiting Pacific Seafood from altering the Cal-Shell property during the pendency of this case.

FAC ¶¶ 88, 98.

Turning to the other plaintiff:

Plaintiff Innovation Marine Protein, LLC is an Oregon limited liability company formed for the purpose of acquiring and operating Trident's seafood processing assets in Newport, Oregon including a fishmeal plant and seafood processing facility. Innovation Marine Protein is owned by Richard Carroll and Edward Backus. Prior to organizing Innovation Marine Protein in 2017, Richard Carrol and Edward Backus formed a partnership in 2016 for the purpose of acquiring a fishmeal plant and associated seafood processing facilities. It was always contemplated by Mr. Carroll and Mr. Backus that their partnership would be

converted into a limited liability company which would own and operate the fishmeal plant and seafood processing facilities.

FAC ¶ 13.

Carrol and Backus have extensive experience in the fishing industry. "Richard Carroll has over 40 years of experience in the design, construction and operation of whiting and surimi processing plants and fishmeal plants." FAC ¶ 14.[3] "Edward Backus has 20 years of experience in fisheries policy and conservation, economic development, and community fisheries finance." FAC ¶ 16.[4]

Trident "*refused to negotiate* with a principal of plaintiff Innovation Marine Protein, LLC to sell its Newport seafood processing facilities and then conspired with Pacific Seafood to develop a two-step scheme to transfer those assets to Pacific Seafood." FAC ¶ 3 (emphasis added). The FAC proceeds to outline Innovation Marine's attempt to enter the Newport seafood processing market in order to potentially compete with Pacific Seafood:

32. On two occasions in November 2016, Richard Carroll met with Trident COO Mike Luchino *to express interest in and pursue the potential purchase of Trident's Seafood processing assets* in Newport including both the meal plant and the surimi processing plant. These discussions continued into December 2016 and were of such a serious nature that Mr. Carroll disclosed that he had experience with an advanced technology that would dramatically increase the profitability of the meal plant by enabling it to produce food grade or nutraceutical protein rather than being limited to fishmeal products used in aquaculture.

33. In January 2017, Mr. Carroll told Mr. Luchino that he was *interested in discussing a price for the trident assets in Newport and negotiating a final deal as soon as possible*. Mr. Luchino promised to contact Trident's [President] and CEO, Joe Bundrant to determine whether Trident was seriously interested in selling these assets. In an email dated January 9, 2017, Mr. Luchino advised Mr. Carroll that he had talked with Mr. Bundrant, who is defendant Frank Dulcich's brother-

---

[3] One could read the FAC as portraying Carroll as perhaps having more experience in the design and construction of seafood processing plants as opposed to experience actually operating such plants. For the purpose of this opinion, I assume Carroll has extensive experience actually operating seafood processing plants.

[4] The FAC is silent as to any experience Backus has in operating seafood processing plants. One assumes Backus' role was to secure financing. However, as discussed below, there are no allegations Backus secured any financing for either the partnership or Innovation Marine.

in-law, that Trident was not interested in selling its assets and "things are at status quo for now."

34. The "status quo" did not last long. Shortly after rebuffing Mr. Carroll, *who would have formed plaintiff Innovation Marine Protein at that time if Trident had been willing to negotiate a deal*, Trident and Pacific Seafood Group conspired to develop a two-step plan to transfer Trident's assets to Pacific Seafood Group in a manner that was designed to evade antitrust scrutiny. First, Trident secretly sold its meal plant to Pacific Seafood Group and the co-conspirators concocted the theory that this transaction was necessary for PSG to support its seafood processing operations in Newport and therefore did not raise antitrust concerns. In fact, with the acquisition of Trident's fishmeal plant, Pacific Seafood Group increased its share of the fishmeal plant processing capacity on the West Coast to over 90%. Second, the co-conspirators developed a plan under which PSG would acquire the surimi processing plant under antitrust law's "failing business exception."

FAC (emphasis added).

Plaintiffs allege Trident sold the fishmeal plant to Pacific Seafood in a secret sale on April 10, 2017, FAC ¶ 3, at price below market value, FAC ¶ 38. Pacific Seafood and Trident then used the May 15, 2017 start of the pacific whiting season (and the 100 or so seasonal jobs that go with it), "to pressure fishermen, the local community, Oregon legislators and regulators into approving an obviously anti-competitive takeover of the surimi plant by monopolist Pacific Seafood." FAC ¶ 3. A shell company owned by Pacific Seafood "either holds an option to acquire the Trident surimi processing plant assets or has already closed on that deal and owns those assets outright." FAC ¶ 2. After Pacific Seafood closed the transactions with Cal-Shell and Trident, it held over 95% of the seafood markets for trawl caught groundfish, onshore whiting and pink shrimp in the Newport market. FAC ¶ 8.

On its Sherman Act Section 1 claim, Innovation Marine alleges:

80. As part of the Pacific Seafood Group led conspiracy to acquire all available seafood processing facilities from its existing competitors on the West Coast when any particular competitor was interested in disposing of such assets, defendants Pacific Seafood Group and Trident Seafoods Corporation conspired to deprive plaintiff Innovation Marine Protein, LLC of the opportunity to enter the

seafood processing and meal plant business in Newport in time to commence operations during the 2017 whiting season.

\* \* \* \*

83. But for the illegal conspiracy to restrain trade implemented by PSG and Trident, and Cal-Shell, plaintiff Innovation Marine Protein LLC would have acquired the Trident processing plant and meal plant assets and successfully entered the seafood processing business in Newport prior to the beginning of the 2017 whiting season. The loss of that opportunity has caused damages to plaintiff Innovation Marine Protein estimated at $2 million in lost net profits in 2017.

84. Plaintiff Innovation Marine Protein seeks an order from this Court requiring Pacific Seafood Group to divest itself of the Trident property that it acquired pursuant to an illegal conspiracy and to transfer that property to plaintiff for the same price paid by PSG to Trident. Plaintiff Innovative Marine Protein further seeks interim injunctive relief prohibiting Pacific Seafood from altering the Trident property during the pendency of this case.

FAC.

Plaintiffs allege the relevant product markets are the west coast seafood markets for groundfish, pacific onshore whiting and pacific coldwater shrimp. FAC § IV. Plaintiffs describe Pacific Seafood's expansion of monopoly power over the past decade through numerous anti-competitive acquisitions and vertical integrations. FAC ¶¶ 29-30. As relevant here:

In early 2014, Pacific Seafood Group established a conspiracy designed to facilitate the acquisition by Pacific Seafood Group of any available seafood processing facility from its existing competitors on the West Coast when any particular competitor was interested in disposing of such assets. Pacific Seafood Group promoted this conspiracy as advancing the common interests of the seafood processing plant seller and Pacific Seafood Group by avoiding the potential for a new market entrant that would disrupt the highly concentrated West Coast markets for trawl-caught groundfish, shoreside-delivered whiting and pink shrimp. During the period of 2014-2017, this conspiracy included at least Ocean Gold Seafoods, Inc. and its affiliates in the Westport Market, California Shellfish Company in the Newport market and Trident Seafoods in the Newport market.

FAC ¶ 31.

As noted, defendants moved to dismiss the complaint on multiple grounds. In response, plaintiffs sought leave to file the FAC.[5] As all antitrust plaintiffs must establish antitrust standing, I turn first to the question of whether Front Street and Innovation Marine have standing to bring these claims.

## STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

When considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant, *Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000), but the court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## DISCUSSION

Section 4 of the Clayton Act provides for a seemingly broad entitlement to damages, allowing treble damages to "any person who shall be injured in his business or property by

---

[5] Plaintiffs originally alleged the two transactions were separate conspiracies, each involving Pacific Seafood. In the FAC, plaintiffs allege each transaction is one part of a single conspiracy between all three defendants to transfer all available seafood processing facilities of Trident and Cal-Shell to Pacific Seafood. FAC ¶ 31.

reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C § 15.[6] Analyzing the legislative history of the Act, however, the Supreme Court concluded Congress did not intend to cast as wide a net as that implied by Section 4's plain language. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983) (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 467-77 (1982)). "Therefore, courts have constructed the concept of antitrust standing, under which they 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them,' to determine whether a plaintiff is a proper party to bring an antitrust claim." *American Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999) (quoting *Associated Gen.*, 459 U.S. at 535).

In evaluating whether a plaintiff has antitrust standing, courts examine: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *American Ad*, 190 F.3d at 1054. Although this determination involves a balancing of all the factors, the first factor, i.e., the nature of the plaintiff's alleged injury, is generally given the greatest weight. *Id.* at 1055.

## I.    Front Street is not a Market Participant

Defendants argue that because Front Street is not a participant in the markets for groundfish, pacific whiting, or pacific shrimp, it lacks antitrust standing. I agree. Nowhere does the FAC allege Front Street is engaged in seafood processing. Instead, the FAC reveals Front Street merely seeks waterfront property it can develop and lease to an actual seafood processor. Even read liberally, the FAC makes clear that Front Street is merely a potential landlord seeking a tenant who will compete in the relevant market.

---

[6] As discussed below, plaintiffs also seek injunctive relief under Section 16.

The alleged conspiracy "prevented [Front Street] from *redeveloping a partially blighted property* with a working ice plant *into modern seafood processing facilities operated by new entrants.*" FAC ¶ 2 (emphasis added). Front Street's "corporate mission" is not to process seafood or compete itself in the relevant market, but "to *acquire and develop* Newport waterfront industrial property *for the express purpose of building the infrastructure* that will diversify the seafood processing sector[.]" FAC ¶ 18 (emphasis added). Front Street sought Cal-Shell's waterfront parcels because those parcels provided an opportunity "to secure adequate industrial property on Yaquina Bay in Newport *to build seafood processing infrastructure*[.]" FAC ¶ 49 (emphasis added). Nowhere does Front Street allege defendants prohibited Front Street from processing seafood. Rather, defendants deprived Front Street only "*of the opportunity to develop seafood processing infrastructure* in Newport in 2014-15." FAC ¶ 81 (emphasis added). In fact, the FAC clearly states that Front Street does not process seafood on two other waterfront lots it owns. Instead, it leases those lots to Seawater Seafoods Company, a seafood processor. FAC ¶¶ 67-68. Front Street is not a market participant in the relevant markets.

Therefore, the question is whether a potential landlord or developer such as Front Street, who does not participate in the relevant market, has antitrust standing to bring claims challenging a conspiracy to exclude potential new entrants into the relevant market. Another Ninth Circuit case involving fishermen and seafood processors provides helpful guidance. *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538 (9th Cir. 1987). In *Eagle*, crewmembers on vessels fishing for tuna brought antitrust claims against the canneries that purchased the tuna caught by the fishermen. "The central argument is that the canneries conspired to set tuna prices at artificially low levels resulting in a reduction of the wages paid to crewmembers and a loss of employment opportunities by them." *Id.* at 539. In looking at the nature of the alleged injury, the court noted

"The requirement that the alleged injury be related to anticompetitive behavior requires, as a

corollary, that the injured party be a participant in the same market as the alleged malefactors."

*Id.* at 540 (quoting *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)).

> In the present case, in order to be a participant in the relevant market, the class members must have been either buyers or sellers of raw tuna. Both sides agree that the class members were not buyers. The alleged malefactors (the canneries) were the buyers. Thus, in order for the alleged injury to be of the type that antitrust laws were intended to forestall, the class members must prove that they were sellers in the raw tuna market. The district court held that the crewmembers were neither consumers nor competitors in the relevant market because they did not directly sell or purchase the tuna. Instead, they were employees of the vessel owners who negotiated and set the prices for the fish. The crewmembers argue that the method by which they were compensated made them sellers. They contend that "share" crewmembers actually own a percentage of the fish caught on a fishing voyage and are thereby sellers along with the vessel owners. Furthermore, the method by which "per tonnage" crewmembers' wages and the union's dues were calculated was so intertwined with the selling process that they, too, should be considered at least "indirect" sellers.

> The district court pointed out, however, after examining the union contract agreements between the union and fishing vessel owners, that:

>> "[n]either the crew of any such vessel nor the union have any rights to control or direct the operation of said vessel or the selling price of fish caught by said vessel. The owner shall have the sole and exclusive authority to determine where and at what price and under what terms and conditions fish caught by said vessel shall be sold and where catches shall be delivered."

> The crewmembers did not negotiate the prices with the canneries, the vessel owners did. The vessel owners are the requisite "sellers" in the relevant market, not the crewmembers or the union. Thus, the class members have not alleged the type of injury antitrust laws were intended to forestall, because the alleged anticompetitive conduct was directed at the vessel owners, not the crewmembers or the union.

*Id.* at 540-41 (alterations in original).

Front Street's relationship to the markets for groundfish, pacific whiting, or pacific

shrimp is much more tenuous and indirect than that of the fishermen in *Eagle* to the tuna market.

Front Street merely seeks to own the land (and future infrastructure) on which its prospective

tenant will someday potentially compete with Pacific Seafood in the Newport markets for groundfish, pacific whiting, or pacific shrimp. Relevant markets are, of course, at the heart of any antitrust claim. After all, "the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market." *Associated Gen. Contractors*, 459 U.S. at 538.

Here, plaintiffs allege that defendants "conspired to monopolize the Newport seafood input markets for trawl caught groundfish, onshore whiting and Pacific shrimp by conspiring to transfer Trident and Cal-Shell's seafood processing assets in Newport to Pacific Seafood." FAC ¶ 91. The fishermen selling into those "input markets," forced to sell to Pacific Seafood, are the "customers" the Sherman Act was enacted to protect. *Associated Gen. Contractors*, 459 U.S. at 538. The other market participants are the processors who purchase that fish, i.e., Pacific Seafood and Front Street's future tenant. In its role as developer and future landlord to a seafood processor, however, Front Street will neither buy nor sell any fish.

Plaintiffs argue, "The nut of this case is that Plaintiffs' lost business opportunity was a consequence of defendants' illegal conspiracy." ECF No. 33 at 20. While that may be true, it is largely irrelevant to whether Front Street suffered any antitrust injury. *See Eagle,* 812 F.2d at 540 (noting the entire point behind the antitrust standing evaluation is "to determine whether a plaintiff, *who has suffered an injury which bears a causal connection to the alleged antitrust violation,* also satisfies the more demanding antitrust standing standard."). Plaintiffs appear to confuse the requirements for Article III standing with the "more demanding standard for antitrust standing." *Lucas Automotive Eng'g v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998) (quoting *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1997) (emphasis omitted)). But

no one disputes that Front Street has Article III standing. Plaintiffs continue, "Put another way, unlike in *Lucas*, but for defendants' conspiracy to violate the antitrust laws, plaintiffs would not have been injured." ECF No. 33 at 20. In addition to flowing from defendants' conduct, however, Front Street's injury must be "of the type the antitrust laws were intended to prevent." *American Ad*, 190 F.3d at 1057.

> The Supreme Court's cases have also "emphasized the central interest [of the Sherman Act] in protecting the economic freedom of participants in the relevant market." *Associated General*, 459 U.S. at 538, 103 S.Ct. 897. We have derived from this principle the "corollary" that the injured party be a participant in the same market as the alleged malefactors." *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985). Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendants' conduct unlawful, are experienced in another market do not suffer antitrust injury.

*American Ad*, 190 F.3d at 1057 (alterations in original).

Front Street's injury, if any, occurred in the Newport waterfront real estate market. *See* FAC ¶ 87 (But for conspiracy, Front Street "would have acquired the Cal-Shell waterfront property in Newport and successfully created the infrastructure for new seafood processor competition"). But Front Street would have suffered an identical alleged injury had Cal-Shell simply moth-balled the blighted plant, "redevelop[ed its own] partially blighted property . . . into a modern seafood processing facility[y]," FAC ¶ 2, or sold the property to a bowling alley developer. Because Front Street would have suffered the same alleged injury in those instances, its injury is not "of the type antitrust laws were intended to prevent." *American Ad*, 190 F.3d at 1057.

Front Street argues that even if it is not a market participant, it has standing because its injury is "'inextricably intertwined' with the injury defendants sought to inflict through their conspiracy, and it therefore falls 'within the area of congressional concern.' *McCready*, 457 U.S. at 484." ECF No. 33 at 25. I disagree. McCready had standing because that conspiracy targeted

psychologists and McCready was "a consumer of psychotherapy services entitled to financial benefits under" her health plan and therefore "within the area of the economy . . . endangered by [that] breakdown of competitive conditions' resulting from" her health plan's refusal to reimburse. *McCready*, 457 U.S. at 480-81. Unlike cases finding a plaintiff's injury "inextricably intertwined" with an antitrust injury sought to be inflicted upon market participants, Front Street is not "a customer [] directly damaged by an act alleged to be in violation of the antitrust laws." *Glen Holly Entm't Inc. v. Tektronix Inc.*, 352 F3d 367, 376 (9th Cir. 2003). No matter Front Street's "corporate mission," its lost opportunity to develop waterfront property it hoped to lease to a market participant is not "inextricably intertwined" with the harm defendants sought to impose on the west coast seafood markets for groundfish, pacific onshore whiting and pacific coldwater shrimp.[7]

The second factor in evaluating a plaintiff's antitrust standing requires the court "to examine the directness or indirectness of the causal connection between the alleged injury and the alleged violation." *Eagle*, 812 F.2d at 541. "The chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate victims of any alleged violation.'" *Id.* In *Eagle*, the court concluded that because the vessel owners control the negotiations with the canneries over the price of the tuna, the crewmembers were ordinary employees and any loss of wages of the crewmembers "is derived from any injury suffered by the vessel owners during the sale of the fish." *Id.* Although Front Street does not allege any economic damages—likely because any such damages would be far too speculative and derivative to recover—the policy considerations behind the antitrust laws demonstrates Front Street's injury, in antitrust terms, is indirect.

---

[7] "While [landlords] have standing to challenge illegal restraints in *their* licensing or renting market, they generally lack standing to challenge restraints in other markets, including that served by their licensees or tenants." Phillip E. Areeda, Herbert Hovenkamp, et al., Anitrust Law, Vol. IIA, ¶ 351a (4th ed. 2013).

"[T]he existence of an identifiable class of persons whose self interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the [plaintiffs] to perform the office of a private attorney general." *Id.* (quoting *Associated Gen. Contractors*, 459 U.S. at 542) (second alteration in original). The vessel owners who suffered the direct antitrust injury in *Eagle* pursued their own antitrust action against the canneries "alleging the same antitrust violations alleged" by the crew members. *Id.* at 542 n.2. Here, the fishermen forced to sell into Pacific Seafood's alleged monopoly in Newport are the direct victims of the alleged conspiracy and could bring their own antitrust action against these defendants. Therefore, declining to allow a more remote party such as Front Street standing to challenge this alleged conspiracy "is not likely to leave a significant antitrust violation undetected or unremedied." *Id.* (quoting *Lucas Automotive*, 800 F.2d at 846).

Finally, Front Street argues that because it seeks only injunctive relief in the form of divestiture, and because antitrust standing requirements are relaxed for those seeking injunctive relief, it may proceed here. This argument is meritless. While Front Street is correct that certain standing requirements—such as the remoteness or speculative nature of the plaintiff's injury[8]— are relaxed for a plaintiff seeking divestiture, "threatened antitrust injury [is] a prerequisite to equitable relief." *Lucas Automotive*, 140 F.3d at 1234 (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986)). Because Front Street did not suffer any antitrust injury, it may not seek divestiture. *See Cargill*, 479 U.S. at 112 ("Section 16 affords plaintiffs injunctive relief only for those injuries cognizable under Section 4.").

---

[8] Because Front Street seeks only injunctive relief, I need not examine other antitrust standing factors such as the speculative nature of the harm, the risk of duplicative recovery, or the complexity in apportioning damages. That said, the specific remedy of divestiture in favor of each relative plaintiff (while excluding any other potential bidders) at a price admittedly below market value would seemingly violate the main goal of antitrust laws, i.e., increased competition.

## II.     Innovation Marine did not take Substantial Steps to Enter Relevant Market

Unlike Front Street, there is no dispute that Innovation Marine was a prospective participant in the relevant market. The dispute instead centers on whether Innovation Marine took "substantial steps" to enter that market. A "potential competitor" such as Innovation Marine "has standing if he can show a genuine intent to enter the market and a preparedness to do so." *Bubar v. AMPCO Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1995). When considering a potential competitor's preparedness to enter a market, courts consider:

1. The background and experience of plaintiff in his prospective business;
2. Affirmative action on the part of plaintiff to engage in the prospective business;
3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business; and
4. The consummation of contracts by plaintiff.

*Id.* at 451-52.

Other than the fact that the plaintiffs in *Bubar* were much more prepared (when compared to Mr. Carrol and Mr. Backus) to enter that intended market, the facts of *Bubar* are remarkably similar to the facts here. Plaintiffs there were former top management employees of a wholly-owned potato, garlic, and onion processing subsidiary of A & B. A & B wanted to sell the subsidiary and eventually sold to Ampco foods, a competitor of the subsidiary. Plaintiffs brought antitrust claims under Sections 1 and 2 of the Sherman Act, alleging Ampco, A & B, and the subsidiary conspired to prevent plaintiffs from purchasing the subsidiary.

Over the course of several months, plaintiffs and Ampco made several "proposals" to purchase the subsidiary. Plaintiffs proposed buying the subsidiary for $10 million. A & B countered with $15 million and plaintiffs responded with a proposal for $12.5 million. Ampco then offered $10 million for only the potato processing portion, at which point A & B proposed a

sale of $13.5 million to plaintiffs for the entire subsidiary. "At this time, all of the proposals were preliminary negotiations, with no firm offers having been made." *Id.* at 446. The *Bubar* plaintiffs took several preliminary steps any prospective purchaser would make:

> During this period of negotiations, the management group had held discussions with several venture capital organizations, seeking their participation as equity investors, and also had held discussions with several banks concerning a line of credit for operating expenses. No firm commitments had been made.

*Id.* at 447.

The management group met with several banks to secure an $8 million line of credit, and despite interest from the banks, no commitments had been made. The group held discussions with multiple venture capital groups, who determined a new corporation would have to be formed to acquire the subsidiary. The management group never finalized the different financial commitments, stock interests, or voting rights of the new corporation. *Id.* at 447-48. The leaders of the management group, along with the lead equity group, met with A & B and proposed buying the subsidiary for $13.5 million and ultimately requested six weeks to complete the financial package. A & B's representative stated he would speak to the president of the company and respond to the plaintiffs, but refused to end discussions with other potential buyers. "No written agreements or letters of intent were signed and no oral commitments to buy or to sell were made." *Id.* at 448. A & B met with Ampco later that day and, over the course of the next few days, agreed to sell the potato division to Ampco for $11,350,000. Like Innovation Marine, the management group alleged their yet-to-be-formed corporation was "frozen out" of the market by defendants' concerted failure to deal. The court concluded:

> Plaintiffs were potential minority stockholders in a corporation yet to be formed, which sought to enter the processed potato market. The venture capital groups who were to be the seventy-five to ninety percent stockholders had not determined whether they were going to invest in the project. Even with the prospective participation of the venture capital groups, another $500,000 to $800,000 would yet have to be raised, either by debt or additional equity

financing, and there were no commitments for such financing. The plaintiffs never had a binding contract or commitment or option to acquire the assets necessary to enter the market. We agree with the district court that the plaintiffs in this posture did not have standing to bring this private treble damage antitrust action.

*Bubar*, 752 F.2d at 454.

As the full extent of the negotiations between Mr. Carroll and Trident are outlined in two brief paragraphs of the FAC, and because those paragraphs reveal the stark contrast between steps taken by the partnership and the plaintiffs in *Bubar*, I include Innovation Marine's entire description of these "serious" discussions:

> 32. On two occasions in November 2016, Richard Carroll met with Trident COO Mike Luchino *to express interest in and pursue the potential purchase of Trident's Seafood processing assets* in Newport including both the meal plant and the surimi processing plant. These discussions continued into December 2016 and were of such a serious nature that Mr. Carroll disclosed that he had experience with an advanced technology that would dramatically increase the profitability of the meal plant by enabling it to produce food grade or nutraceutical protein rather than being limited to fishmeal products used in aquaculture.

> 33. In January 2017, Mr. Carroll told Mr. Luchino that he was *interested in discussing a price for the trident assets in Newport and negotiating a final deal as soon as possible*. Mr. Luchino promised to contact Trident's [President] and CEO, Joe Bundrant to determine whether Trident was seriously interested in selling these assets. In an email dated January 9, 2017, Mr. Luchino advised Mr. Carroll that he had talked with Mr. Bundrant, who is defendant Frank Dulcich's brother-in-law, that Trident was not interested in selling its assets and "things are at status quo for now."

FAC (emphasis added).

Utterly lacking within this description is any allegation that the partnership had the financial commitments necessary to even make a firm offer (to say nothing of actually completing the purchase). Despite Mr. Backus' apparent background in securing financing, he appears to have done nothing in advance of Mr. Carroll's "discussions" with Trident. The FAC is silent as to any discussions regarding a line of credit for operating expenses of the new company. There are no allegations detailing contracts, let alone discussions, between the proposed

company and the fishermen it would need to secure product from. There are no allegations regarding the ownership percentages or control of Innovation Marine, the yet-to-be-formed company. Instead, the FAC reveals Mr. Carrol informed Mr. Luchino he knew of "advanced technology" that would help make the company profitable, and "express[ed] interest in [] pursu[ing] the potential purchase of Trident's Seafood processing assets[.]" FAC ¶ 32. "In January 2017, Mr. Carroll told Mr. Luchino that he *was interested in discussing a price for the Trident assets* in Newport *and negotiating a final deal as soon as possible*." FAC ¶ 33. These were not serious discussions. Mr. Carrol had yet to even discuss a price with Trident, let alone make a "proposal" to Trident.[9] These steps pale in comparison to the steps the management group in *Bubar* took to purchase the subsidiary. "This is pie in the sky, not 'substantial demonstrable steps to enter an industry.'" *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d 1460, 1466 (9th Cir. 1993).

Defendants argue that because Innovation Marine did not file Articles of Organization with the Oregon Secretary of State until after Trident sold its assets to Pacific Seafood, it could not suffer any antitrust injury. Innovation Marine filed Articles of Organization on April 21, 2017.[10] Snider Decl., Ex. 1; ECF No. 27. By law, April 21, 2017 is the date Innovation Marine's "corporate existence beg[an]." Or. Rev. St. § 60.051(1). Trident sold the fishmeal plant to Pacific Seafood on April 10, 2017. FAC ¶ 3. Innovation Marine makes no argument, and points to no case, demonstrating a corporation can suffer an injury that occurs before the corporation exists. Instead, Innovation Marine argues that fact it did not incorporate until after the sale is a "trivial"

---

[9] Even a "proposal" from Mr. Carroll would fall well short of the affirmative steps necessary to provide antitrust standing to a potential competitor. *See Bubar*, 752 F.3d at 453 (discussing multimillion dollar proposals management group made, followed by counter proposals from A & B, stood "in contrast" to other situations involving "firm offers.").

[10] Plaintiffs do not object to the Court taking judicial notice of public documents related to Innovation Marine held by the Corporation Division of the Oregon Secretary of State. Fed. R. Evid. § 201(d); *Lee v. County of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

point because, "[h]ad negotiations progressed, Mr. Carroll could easily have formed Innovation Marine at that time." ECF No. 33 at 18 n.4. But this admission simply demonstrates Mr. Carroll's discussions with Trident never progressed to a serious level. After all, Mr. Carroll formed Innovation Marine "for the purpose of acquiring and operating Trident's seafood processing assets in Newport, Oregon including [the very assets Mr. Carroll spoke to Trident about during November 2016 through January 2017]." FAC ¶ 13. That the discussions never advanced to the point where Mr. Carroll formed the company whose only purpose was to purchase Trident's assets demonstrates neither Innovation Marine nor the preexisting partnership took substantial steps to complete the sale.[11] In fact, it appears the most "substantial step" taken by Innovation Marine towards acquiring Trident's Newport assets was the filing of this antitrust action seeking divestiture of those assets to Innovation Marine.

Innovation Marine argues, "Indeed, the only *Bubar* factor that plaintiffs do not meet is the consummation of contracts which, of course, Pacific Seafood and its co-conspirators colluded to prevent." ECF No. 33 at 23. Innovation Marine is correct that the consummation of contracts is one factor courts look to when evaluating whether a potential competitor was prepared to enter a market. *Bubar*, 752 F.2d at 451-52. As demonstrated above, however, Innovation Marine failed

---

[11] Innovation Marine argues that even if the fact that it did not exist at the time of the sale bars its claim, amending the complaint and naming the prospective partnership would cure this problem. Ordinarily, shareholders lack standing to bring a claim for an injury suffered by the corporation. *Bubar*, 752 F.2d at 450-51. The same holds true for prospective shareholders of a prospective corporation. *Id.* at 451. Because the rule could potentially be relaxed if "a person had all the resources to enter a market and intended to form a solely-owned corporation rather than an individual enterprise," for the purpose of this opinion I assume plaintiffs could amend the complaint naming the partnership. *Id.* Although I assume the partnership could potentially proceed as plaintiffs, I do not overlook the perhaps insurmountable hurdles the partnership would face going forward. *See Solinger v. A & M Records*, 718 F.2d 292, 299 (9th Cir. 1983) (per curiam) (Denying antitrust standing in failure to deal case brought by prospective shareholder in prospective company because, "The conveniences and immunities that arise from doing business through corporate entities carry with them the costs of having these corporate entities seek their remedies in court for injuries to their business or property interests. A shareholder of a corporation injured by antitrust violations has no standing to sue in his or her own name, and *a fortiori,* a prospective shareholder ordinarily would have no standing."). Because neither the partnership nor Innovation Marine took substantial steps to enter the market, neither party has standing.

to allege that it either: (1) took any real "substantial steps" to enter the market; or (2) possessed the financial ability to purchase the equipment or facilities necessary to enter the market. Additionally, the court in *Bubar* rejected Innovation Marine's argument that the lack of a consummated contract with the alleged conspirator should not factor against it:

> All agree that the only way the management group could have become a competitor was to acquire Rogers or its assets. The first obstacle to establishing preparedness is that the management group did not have a binding contract to acquire the assets necessary to compete. The management group asserts that this should not be a factor because the contract that was necessary was to be made with one of the alleged antitrust conspirators. Yet, on the other hand, when our inquiry at this stage of the proceeding is one of standing, and one element is to determine how close the management group was to becoming a competitor, the lack of a contract to obtain the assets necessary to compete is surely a relevant factor, as the district court properly determined.

*Id.* at 452.

While I assume at this stage that Mr. Carroll and Mr. Backus had the background and experience to operate the prospective seafood processing company, they did not take the requisite affirmative actions to engage in the prospective business, did not allege the financial ability to engage in the business, and failed to consummate any contracts necessary of any prospective competitor.[12] Therefore, Innovation Marine lacks antitrust standing.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

---

[12] At oral argument, Innovation Marine stated that if granted leave to file an amended complaint, it would include allegations regarding steps taken to secure financing. But Innovation Marine included no such allegations in the proposed FAC, filed in response to defendants' arguments that it lacked standing as a prospective participant. The time to include such allegations was in the FAC. Second, even assuming Innovation Marine secured financing, the allegations reveal it never engaged in serious discussions to purchase the assets.

**CONCLUSION**

Defendants' motions to dismiss for lack of standing, ECF No. 21, 24-25, are GRANTED. No amount of repleading will turn Front Street into a participant in the relevant market. And no amendment will backdate Innovation Marine's filings with the Secretary of State. As explained above, amending to add the preexisting partnership as a plaintiff will not somehow turn the initial talks Mr. Carrol had with Trident into the "substantial steps" necessary for antitrust standing. Because Innovation Marine and Front Street lack standing, and because leave to amend would be futile, this action is DISMISSED, with prejudice.

IT IS SO ORDERED.

DATED this 23rd day of March, 2018.


_____/s/ Michael McShane_____
Michael McShane
United States District Judge